Opinion delivered February 5, 1968
[Rehearing denied March 11, 1968.]

*Charles J. Hlavinka,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston,* Asst.
Atty. Gen., for appellee.

Cᴏɴʟᴇʏ Bʏʀᴅ, Justice. Appellant Ollis Heard was
convicted of burglary and grand larceny in connection
with the breaking and entering of the Broadway Shoe
Shop, 525 East Broad Street, Texarkana, Arkansas,
and the taking and carrying away of certain property
therefrom. For reversal he relies upon the following:

"The trial court erred in admitting into evidence
certain statements allegedly made by the defendant
as a result of custodial interrogation because such
statements had been made prior to the defendant's
having been taken before a magistrate, without his
having been informed of his right to remain silent,
without his having been warned that any statement
might be used against him, without his having been
informed of his right to consult with a lawyer and

to have a lawyer present during an interrogation, without his having been informed that a lawyer would be appointed to represent him if he were unable to employ one and because the alleged statements were made under duress and pressure."

The record shows that a warrant was outstanding for appellant's arrest and that when the officers first attempted to apprehend him he ran, notwithstanding two warning shotgun shots. He was finally apprehended the same day in a marshy area behind the Ritz Motel by officers from both Texarkana, Arkansas and Texarkana, Texas. When he was taken into custody by Lt. Thurman Quisenberry, he was suffering from a buckshot wound inflicted by Max Tackett, Chief of Police of Texarkana, Arkansas. Immediately upon arrest he was fingerprinted and taken to a doctor for treatment of the wound (in the nature of a pump knot). Appellant was then jailed until around 1:00 p. m. the next day, when he was taken to Chief Tackett's office. There appellant signed a statement showing that the *Miranda* warning (*Miranda* v. *Arizona*, 384 U.S. 436 [1967]) had been given and his rights thereunder waived. He also signed eleven other typed statements connecting him with eleven burglaries in the city of Texarkana.

The *Miranda* warning consisted of twelve mimeographed questions on legal-size paper, with space between each question for the answer. The record shows that answers were inserted and the statement signed by appellant and witnessed by Max Tackett and Thurman Quisenberry. The other eleven statements were taken by typing the question and then the answer. Appellant's signature on each statement was witnessed by the officers present at the time.

Under our statutes, failure to take an arrested person before a magistrate before interrogating him does not vitiate a confession so obtained. *Paschal* v. *State*, 243 Ark. 329, 420 S. W. 2d 73 (1967).

Regarding the *Miranda* warning, appellant contends that it was nothing more than a preliminary ritual to the police's interrogation and that the record shows appellant incapable of reading and comprehending the prepared questions. In this connection Porter Eastland, appellant's third grade teacher, testified that appellant was unable to read and write. Substantially the same testimony was given by Whitaker Allen, Jr., appellant's seventh and eighth grade coach. Mott H. Mosely, principal of Booker T. Washington High School, testified that in his opinion appellant was unable to read and write. The latter opinion was based on appellant's scholastic record and not on any personal observation by Mr. Mosely.

Appellant says that when he was taken to the fingerprint room on the day of his arrest, Lt. Quisenberry got angry and reached for a club, "something like a nightclub," and that while Lt. Quisenberry was doing this, Chief Tackett kicked him. He asserts that before he was taken to the doctor he was forced to sign some statements which he couldn't read. Appellant also says that when he was brought to the Chief's office the day after the arrest, they handed him some papers and the Chief began reading to him; and that after Chief Tackett read this thing to him, the Chief told him "there wasn't no need of me trying to hold back anything, that I might as well go on and clear everything up, and he handed me some more papers and things, and told me to sign them." Appellant says that he can only write and spell his name but cannot read.

On the Motion to Suppress, during appellant's interrogation by the court, the following occurred:

"Q   All right, go ahead with what you were about to tell me. You were about to tell me what scared you into signing the statements the second day, I believe.

"A   He told me to go ahead on—that I might as well to go on and sign them. I don't know what it was.

He was reading something; I don't know what it was, and then he mentioned that I had already signed the papers, so I went on and signed them then. I don't know how many there was. There wasn't too many, and then he read this other statement off. He read that off to me then, and he said, 'We've got you now.'

"Q  This was Chief Tackett talking all the time you say 'he?'

"A  Yes, sir."

The officers testified they personally knew appellant, he having been arrested before. They denied any abuse of appellant and explained that the *Miranda* warning was given by handing appellant a copy of the questions they proposed to ask him. In addition they read and explained the questions to him before they put the paper in the typewiter and started typing his answers to each specific question. As appellant responded, the officer would type the answer before proceeding to the next question. After the questions were completed, the sheet was removed for signatures. The same procedure was followed with the other statements, except that the questions were typed as they were asked.

With respect to the language used in the answers, Chief Tackett explained as follows:

". . . then I read each question as I came to it, and asked him if he understood what it said. And then I wrote down exactly what he told me. Now, I didn't just say yes or no, or uh-huh. When he said, 'Uh-uh,' or 'Uh-huh,' or 'Yeah,' I said, 'Now, tell me exactly what you mean.' And for instance, on this first answer to the first question, 'Yes, I understand that I do not have to give any statement.' I nailed him down to that very thing before I quit it, and I did that on each occasion, on each case."

When we consider appellant's previous experience with the law, and compare the answers he gave in the statements with those he made in open court in response to questions from the lawyers and the trial court, we find that the evidence is sufficient to sustain the trial court's finding that appellant voluntarily made the confessions after having been fully advised of his constitutional rights and having knowingly waived the same.

Notwithstanding his inability to read, the record refutes any inability to comprehend the questions asked. It may be true that the officers did some editorializing in writing down appellant's answers, but this is not an uncommon problem in recording answers, and we do not find the discrepancies of such character as to make a material difference.

Nor can we find any merit in the contention that the *Miranda* warning should have been given anew each time the officers questioned appellant about a different burglary. The record shows that the questioning was continued after the warning was given, with only brief interruptions.

Affirmed.

Brown, J., not participating.